Marye **WAHL**, Plaintiff,

v.

**GENERAL ELECTRIC COMPANY,
et al., Defendants.**

Case No. 3:13–cv–0329.

United States District Court,
M.D. Tennessee,
Nashville Division.

Nov. 14, 2013.

Tor A. Hoerman, Eric M. Terry, Kenneth J. Brennan, TorHoerman Law Edwardsville, IL, R. Christopher Gilreath, Gilreath & Associates, Memphis, TN, for Plaintiff.

Christopher M. Strongosky, Heidi L. Levine, DLA Piper US LLP, New York,

NY, Matthew J. Evans, Dwight E. Tarwater, Paine, Tarwater, and Bickers, LLP, Knoxville, TN, for Defendants.

## MEMORANDUM

ALETA A. TRAUGER, District Judge.

Defendants General Electric Company, GE Healthcare AS, and GE Healthcare, Inc. (collectively, "GE") have filed a Motion for Summary Judgment (Docket No. 35). For the reasons stated herein, the motion will be granted, and the plaintiff's claims will be dismissed.

## BACKGROUND

### I. Facts and Procedural History

Marye Wahl, a resident of Nashville, Tennessee since 1999, suffers from nephrogenic systemic fibrosis ("NSF"). NSF is a progressive, incurable, and potentially fatal systemic disease that, among other deleterious effects, hardens organs and disfigures the skin. It has only one known cause: use of gadolinium-based contrast agents ("GBCAs"), such as GE's "Omniscan" product.

On May 8, 2006 and November 1, 2006, Wahl underwent Magnetic Resonance Imaging ("MRI") tests at St. Thomas Hospital in Nashville. In connection with those MRI tests, her physicians administered Omniscan as a contrast agent. In February 2007, GE added a "black box" warning to its Omniscan package that warned physicians of the risks of using GBCAs (including Omniscan) on renally impaired patients. The warning was too late to help Wahl.[1]

Unrebutted evidence introduced by the defendants establishes that, from the point that GE first offered Omniscan on the market in 1993, (1) the FDA-required label on each Omniscan package contained a two-year expiration date, and (2) the product was manufactured abroad—either in Ireland or Norway. Accordingly, although the specific containers of Omniscan administered to Wahl in May and November 2006 are unknown, there is no genuine dispute that the product contained a label bearing a two-year expiration date. Therefore, even assuming that the Omniscan administered to Wahl was manufactured on the date of administration—an unrealistically generous assumption—the products expired no later than May 8, 2008 and November 1, 2008, respectively.[2]

For its part, GE does not dispute the following relevant facts: (1) it issued a uniform set of warnings and instructions for the use of Omniscan, which was distributed internationally; (2) the package inserts relevant to this litigation and GE's

---

1. Wahl apparently was renally impaired at the time of her MRI tests.

2. Although Wahl has argued that she requires discovery to probe GE's averments, she did not file the required affidavit under Fed. R.Civ.P. 56(d). Nor, even in the context of her unsworn briefing, has she explained what information she could uncover that would create a genuine dispute of material fact regarding the product label. Even if the court were to excuse the failure to comply with Rule 56(d), the court is unpersuaded that discovery would yield any information rebutting the defendants' representations that the product contained a two-year expiration date from 1993 forward, including the Omniscan administered to Wahl.

On a separate note, although GE in part relies on a supplemental affidavit introduced in support of the defendants' Reply (see Docket No. 53, Ex. 3, Supplemental Affidavit of Danny Healy), the court finds it appropriate to consider that supplemental affidavit. The Supplemental Affidavit addresses specific (albeit largely speculative) arguments raised in the plaintiffs' Response brief. Furthermore, Wahl has had ample time to cure any conceivable prejudice, including the opportunity to present evidence and argument at the October 18, 2013 hearing on the motion and in post-hearing submissions ordered by the court.

"Omniscan Safety Review Advisory Meeting Briefing Document" both listed a New Jersey address for GE (or its predecessors); (3) GE was subject to New Jersey law when selling Omniscan, (4) GE made reporting, warning, and labeling decisions in New Jersey, and (5) GE used an unknown third-party distributor to distribute Omniscan to the facility where Wahl was administered Omniscan.[3]

Before Wahl filed the instant lawsuit (indeed, before she was even diagnosed with NSF), multiple other plaintiffs injured by GBCAs filed lawsuits against GE and other GBCA manufacturers, generally alleging product defect theories. Many of these lawsuits were consolidated into a Multi–District Litigation ("MDL") proceeding before the United States District Court for the Southern District of Ohio (the "MDL Court").[4] After the MDL was created, the MDL Court issued a March 25, 2008 Case Management Order ("CMO No. 3"). (Docket No. 51, Ex. 3.) In relevant part, CMO No. 3 permitted potential plaintiffs to file actions in the Southern District of Ohio, whether or not jurisdiction or venue was otherwise proper.

On October 4, 2010, while Wahl was living in Tennessee, Wahl was diagnosed with NSF by a physician at Vanderbilt Dermatology in Nashville. Wahl apparently continues to receive treatment in Tennessee.[5] At least for purposes of summary judgment, the parties do not dispute that the May 2006 and November 2006 exposures to Omniscan caused Wahl to contract NSF. On May 11, 2011, pursuant to CMO No. 3, Wahl filed the instant lawsuit against GE directly in the Southern District of Ohio.

The defendants apparently settled all but a handful of the 900+ lawsuits comprising the MDL. Wahl's case, among a handful of others, was not resolved. Pursuant to an Agreed Order of Transfer Pursuant to 28 U.S.C. § 1404(a), the MDL Court transferred Wahl's lawsuit to this court.[6]

## II. *GE's Motion for Summary Judgment*

Following transfer, GE moved for summary judgment, arguing that Wahl's

---

3. Although the plaintiffs did not formally introduce evidence concerning these particular facts, GE made the referenced factual representations in a legal brief in another GBCA case against GE concerning the potential application of New Jersey law to the issue of punitive damages. (*See* Docket No. 55, Ex. 1.) After this court pressed GE at oral argument as to whether it would admit or dispute those representations for purposes of the instant motion before *this* court, GE in its Supplemental Memorandum has admitted that those facts should be taken as true. (*See* Docket No. 64. Ex. 9 ("[T]he GE Defendants do not dispute any statements made in the Kerrigan Motion[.]").)

4. It also appears that some GBCA lawsuits were filed, and remained, in state court. (*See, e.g.*, Docket No. 51, Ex. 4 (plaintiffs' brief in Pennsylvania state court); Docket No. 64, Ex. 2 (referencing motions filed by GE in California state court).)

5. In support of her opposition, Wahl attached letters from treating physicians in Nashville (*see* Docket No. 41, Exs. 5 (Dr. John Corey, Vanderbilt University Medical Center ("VUMC") Department of Anesthesiology) and 6 (Dr. Laura Y. McGirt, Vanderbilt Dermatology)), as well as a letter from the Executive Director at the Abintra Montessori School in Nashville (*id.*, Ex. 7), where Wahl was employed as of April 3, 2012. Wahl also attached a copy of her October 4, 2010 diagnosis at Vanderbilt Dermatology. (Docket No. 41, Ex. 1 (Dr. Jeffrey Zwerner, Vanderbilt Dermatology).) The physician letters present a bleak picture of Wahl's quality of life and the continuing progression of her disease.

6. Although the parties at times refer to the transfer as a "remand," that term is a misnomer, because the case was not filed in this court in the first instance.

claims are barred by the statute of repose set forth in the Tennessee Products Liability Act ("TPLA"), Tenn.Code Ann. § 29–28–103. In response, Wahl argues that her claims should be governed by New Jersey law, which does not have an applicable statute of repose.[7]

In support of its Motion for Summary Judgment, GE filed a supporting Memorandum of Law (Docket No. 36), a Statement of Undisputed Material Facts (Docket No. 37) (defendants' SUMF), and evidentiary materials, including, *inter alia*, the Declaration of Danny Healy (Docket No. 35, Ex. C.) Wahl filed a Response in opposition (Docket No. 41), a combined Response to the defendants' SUMF and a Statement of Additional Undisputed Material Facts ("Wahl's SUMF") (Docket No. 40), and evidentiary exhibits (Docket Nos. 45 (Exs. A–H), 46 (Ex. I), 47 (Exs. J–N)).[8] GE filed a Reply (Docket No. 51), in support of which it filed a Response to the Wahl's SUMF (Docket No. 52) and several exhibits, including the Supplemental Declaration of Danny Healy (Docket No. 51, Ex. 1), the MDL Court's CMO No. 3, and a legal brief filed by the plaintiffs in two other MDL cases (*Id.,* Ex. 4). The plaintiffs filed a Sur–Response (Docket No. 55), which attached a legal brief filed by the defendants in those two other MDL Cases. (*Id.,* Ex. 1.)[9]

On October 18, 2013, the court heard oral argument on the motion. (*See* Docket No. 62, Transcript of Proceedings.) The court stated on the record that it would apply Tennessee choice of law rules in making its choice of law analysis. The court ordered the parties to file supplemental briefs as to whether, under Tennessee choice of law rules, Tennessee law or New Jersey law should apply to Wahl's claims. The parties accordingly filed supplemental briefs. (Docket Nos. 64(GE) and 65 (Wahl).)[10]

### SUMMARY JUDGMENT STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a) (2013). At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Moldowan v. City of Warren,* 578

---

7. The parties have also argued about whether, pursuant to Ohio choice of law rules, Ohio law might apply to Wahl's claim. As explained herein, the court rejects the premise that Ohio choice of law rules would apply in the first place, thereby rendering moot the parties' arguments concerning the potential application of Ohio law.

8. The plaintiffs also filed a separate exhibit containing printouts of certain cited cases. (*See* Docket No. 48 (Ex. O).)

9. As explained herein, each party here has attempted to show that the other party (or at least its attorneys) previously took a legal position inconsistent with the party's position in this lawsuit. For example, in support of its Reply, GE introduced a copy of a legal brief filed by the plaintiffs in two other MDL cases, in which the plaintiffs argued that New Jersey law should not apply to the issue of punitive damages. In support of Wahl's Sur–Reply, Wahl introduced a legal brief filed by GE in one or both of those cases, in which GE argued that New Jersey law should apply to the issue of punitive damages.

10. GE's Supplemental Brief attached, *inter alia*, the Affidavit of Heidi Levine (GE's counsel of record in the MDL) concerning previous developments in other MDL cases (Docket No. 64, Ex. 2), and a sur-reply filed by a plaintiff in another MDL case (Docket No. 64, Ex. 3), in which that plaintiff argued that the conduct giving rise to the plaintiff's injury occurred primarily in Illinois—where that plaintiff was prescribed and administered Omniscan.

F.3d 351, 374 (6th Cir.2009); *see also Celo-tex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is an absence of evidence to support the non-moving party's case. *Id.* (citing *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548). "When the moving party has carried this burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).) The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.*

At this stage, "'the judge's function is not ... to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan,* 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party." *Moldowan,* 578 F.3d at 374 (citing *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348). But "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient," *Moldowan,* 578 F.3d at 374 (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505), and the non-movant's proof must be more than "merely colorable." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.

*Moldowan,* 578 F.3d at 374 (citing *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348).

## ANALYSIS

### I. Which Jurisdiction's Choice of Law Rules Apply?

■ The procedural posture of this case places this court in an atypical position with respect to applying choice of law rules. Typically, when a defendant transfers a case to another district under 28 U.S.C. § 1404, the *Erie* doctrine requires the transferee court to apply the choice of law rules of the transferor state. *Van Dusen v. Barrack,* 376 U.S. 612, 637–39, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). In a case filed originally in one judicial district (the Middle District of Tennessee, for example) and subsequently transferred to another jurisdiction (the Southern District of Ohio, for example), the choice of law analysis is relatively straightforward: the Ohio court (the "transferee" court) applies the choice of law rules of Tennessee (the "transferor" court). However, where, as here, an MDL Court provides for direct filing of foreign cases pursuant to J.P.M.L. R. 7.2(a), the parties skip a step, leading to potentially confounding implications: because the foreign cases were filed directly in the MDL Court, the MDL Court is not (at least officially) acting as a "transferee" of a case transferred from another judicial district. Indeed, formally speaking, *this* court is the "transferee" of Wahl's case, which was filed directly in Ohio.

If this court applied *Van Dusen* mechanically, the court would be obligated to apply the choice of law rules of Ohio to this case, even though, as both parties acknowledge, this case has absolutely no legal or factual connection to Ohio, other than the procedural reality that CMO No. 3 permitted Wahl to file her case directly in the MDL Court in Ohio.

Most of the courts that have considered this peculiar procedural posture have stated that it is appropriate to apply the choice of law rules of the "originating" jurisdiction (*i.e.*, where the case would have brought but for the CMO permitting direct filing), rather than the choice of law rules of the MDL Court. These courts have generally reasoned that the direct filing procedure is simply designed to promote judicial economy and conserve the parties' resources, not to alter the choice of law rules.[11]

On the other hand, a handful of district courts, generally with little or no analysis, have applied the choice of law rules of the MDL court.[12] Several of these courts

(and, initially, the parties here) inappropriately have relied on the district court decision in *In re Vioxx* as persuasive authority for the proposition that the MDL court's choice of law rules should apply. To the contrary, the court in *In re Vioxx* merely discussed the issue in *dicta*, expressly *declined* to address it, noted in a detailed footnote why it would be odd to apply the MDL court's choice of law rules over those of the originating court, and urged future courts to examine the issue carefully. *See In re Vioxx*, 478 F.Supp.2d 897, 904, 904 n. 2 (E.D.La.2007). Thus, the court finds unpersuasive those cases that, generally without analysis, have relied on *In re Vioxx* for the very proposition that it declined to address.

---

**11.** *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, No. 3:09–md–2100–DRH–PMF, 2011 WL 1375011 (S.D.Ill. Apr. 12, 2011) ("[T]he better approach is to treat foreign direct filed cases as if they were transferred from a judicial district sitting in the state where the case originated," which is "the state where the plaintiff purchased and was prescribed the subject drug. Thus, for a foreign direct filed member action involving a plaintiff that purchases and was prescribed the subject drug in Tennessee, the Court will treat that plaintiff's claims as if they were transferred to this MDL from a district court in Tennessee."); *In re Avandia Mktg, Sales Practices & Prods. Liab. Litig.*, No. 07–MD–01871, 2012 WL 3205620, at *2 (E.D.Pa. Aug. 7, 2010) ("The Court has concluded, as have other MDL courts, that such cases should be governed by the law of the states where Plaintiffs received treatment and prescriptions for Avandia. This ruling will promote uniform treatment between those Plaintiffs whose cases were transferred into the MDL from their home states and those Plaintiffs who filed directly in the MDL."); *In re Watson Fentanyl Patch Prods. Liab. Litig*, 977 F.Supp.2d 885, 888, 2013 WL 4564927, at *2 (N.D.Ill. Aug. 27, 2013) ("[U]nlike the usual case filed in this district, the present case has no connection with Illinois other than the fortuity that the JPML authorized an MDL proceeding to take place here, supervised by the undersigned judge. Illinois is

essentially an artificial forum created for purposes of convenience and efficiency. That is doubly true for the present case, which was filed here only by virtue of a court-approved direct-filing procedure whose sole purpose was to maximize convenience and save the parties' and judicial resources. Given the circumstances, it would not make a great deal of sense to apply Illinois law in this case, or even Illinois' choice of law rules. Indeed, the prevailing rule in this situation is that in a case that was directly filed in the MDL transferee court but that originated elsewhere, the law (including the choice of law rules) that applies is the law of the state where the case originated."); *In re Bausch & Lomb Inc. Contacts Lens Solution Prods. Liab. Litig.*, MDL No. 1785, 2007 WL 3046682, at *3 (D.S.C. Oct. 11, 2007) ("[I]t would be an odd result to subject plaintiffs to [the law of the MDL forum] simply because they took advantage of the direct filing procedure-a procedure that provides benefits to all parties and preserves judicial resources.")

**12.** *See, e.g., In re Express Scripts, Inc, PBM Litig.*, Master No. 4:05–MD–01672–NSL, Member No. 4:05–CV–00862 SNL, 2007 WL 4333380 (E.D.Mo. Dec. 7, 2007) (relying on *In re Vioxx*); *In re Welding Fume Prods. Liab. Litig.*, 245 F.R.D. 279, 295 n. 90 (N.D.Ohio 2007) (citing *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 454 (E.D.La.2006)).

The court finds that, under the procedural circumstances presented here, Tennessee choice of law rules apply. This case has no connection to Ohio, other than the fact that the case was consolidated for pretrial proceedings in the Southern District of Ohio. The MDL Court permitted direct filing in the interest of judicial economy and preserving the parties' resources. Moreover, the principle of *Van Dusen* is premised on the assumption that *venue was proper* in the judicial district in which the plaintiff originally filed the case. *See* 376 U.S. at 634, 84 S.Ct. 805 ("There is nothing, however, in the language or policy of § 1404(a) to justify its use by defendants to defeat the advantages accruing to plaintiffs who have chosen a forum which, although it was inconvenient, *was a proper venue.*") (emphasis added). Here, it is undisputed that venue was not otherwise proper in the Southern District of Ohio, and CMO No. 3 expressly stated that direct filing did not constitute an admission by any party that venue or jurisdiction in the Southern District of Ohio was otherwise proper. Therefore, consistent with the better-reasoned authority, the court will apply the choice of law rules of Tennessee to determine what state's substantive law should govern Wahl's claims. In light of the court's decision to apply Tennessee choice of law rules, the parties' robust discussion concerning the application of Ohio choice of law rules is rendered moot.[13]

## II. *Relevant Statutes of Repose*

In Tennessee, "actions for or on account of personal injury ... from the manufacture, construction, design, formula, preparation, assembly, testing, service,

warning, instruction, marketing, packaging or labeling of any product" are "product liability actions" subject to the TPLA. *See* Tenn.Code Ann. § 29–28–102(6). The TPLA has a unique statute of repose, under which all product liability actions "must be brought within ten (10) years from the date on which the product was first purchased for use or consumption, or within one (1) year after the expiration date of the anticipated life of the product, whichever is the shorter." *Penley v. Honda Motor Co., Ltd.*, 31 S.W.3d 181, 183 (Tenn.2000) (quoting Tenn.Code Ann. § 29–28–103); *see also Montgomery v. Wyeth*, 580 F.3d 455, 456, 456 n. 1 (6th Cir.2009). The "anticipated life" of the product is "determined by the expiration date placed on the product by the manufacturer when required by law but shall not commence until the date the product was first purchased for use or consumption." Tenn.Code Ann. § 29–28–102(1). Thus, under the TPLA, a product liability action must be brought within one year of the expiration date for products that are required, by law, to bear such a date. *See Montgomery*, 580 F.3d at 463 (affirming district court's dismissal of plaintiff's claims under the TPLA statute of repose, where the plaintiff filed her lawsuit more than one year after the expiration date on the product). Although the statute of repose can extinguish claims before they accrue, the Tennessee Supreme Court and the Sixth Circuit have repeatedly upheld the statute's constitutionality and its application. *See Montgomery*, 580 F.3d at 463 (listing cases); *Penley*, 31 S.W.3d at 184.

Here, if Tennessee substantive law applies, the burden would be on GE to

---

13. The court notes that direct-filed cases could present an additional layer of complexity: if a foreign case filed in an MDL court could have been brought in more than one jurisdiction originally, where did the direct-filed case "originate"? The court need not address that consideration here, because the MDL court transferred the case here with the consent of both parties.

establish that the TPLA statute of repose bars Wahl's claims. *See Woodard v. Gross,* No. 2011–02316–COAR3–CV, 2012 WL 3893519, at *8 (Tenn.Ct.App. Sept. 10, 2012) ("[A] defendant who relies on an affirmative defense, such as the statute of repose, in a summary judgment motion, must point to undisputed facts that establish the defense"); *Pratcher v. Methodist Healthcare Memphis Hosps.,* 407 S.W.3d 727, 739 (Tenn.2013) (endorsing *Woodard* and holding that "the statute of repose is an affirmative defense that is generally waived if not timely raised."). Wahl does not dispute that, if Tennessee law applies, her lawsuit is a "products liability action" governed by the TPLA. Assuming *arguendo* that Tennessee law applies, GE has met its burden to introduce undisputed facts that show that the TPLA statute of repose bars Wahl's claims. She was required to file her lawsuit by May 8, 2009 with respect to the first incident (one year from May 8, 2008, the latest possible date of expiration relative to the May 8, 2006 procedure) or November 1, 2009 with respect to the second incident (one year from November 1, 2008, the latest date possible date of expiration relative to the November 1, 2006 procedure). She did not file this lawsuit until 2011. Therefore, if the TPLA applies, the statute of repose bars her claims.

By contrast, the parties agree that New Jersey has no statute of repose applicable to Wahl's claims. (*See* Docket No. 62, Transcript of Oral Argument, at 22:15–21.) Therefore, if New Jersey substantive law applies, Wahl's claim will proceed.

Because the court is faced with a potentially dispositive conflict of laws, the court must conduct a choice of law analysis.

### III. *Choice of Law Analysis*

#### A. Choice of Law Standards

■ With respect to choice of law issues, Tennessee has adopted the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws (the "Restatement"). *Montgomery,* 580 F.3d at 459 (citing *Hataway v. McKinley,* 830 S.W.2d 53, 59 (Tenn.1992)). "Under this approach, 'the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation.'" *Id.* (quoting *Hataway,* 830 S.W.2d at 59). "Tennessee adopted this position 'because generally the law of the state where the injury occurred will have the most significant relationship to the litigation.'" *Id.* (quoting *Hataway,* 830 S.W.2d at 59). "Thus, the most significant relationship 'provides a "default" rule whereby trial courts can apply the law of the place where the injury occurred when each state has an almost equal relationship to the litigation.'" *Id.*

■ Contacts a court should consider when assessing a state's relationship to the litigation include: "(a) the place where the injury occurred[;] (b) the place where the conduct causing the injury occurred[;] (c) the domicile, residence, nationality, place of incorporation and place of business of the parties[;] and (d) the place where the relationship, if any, between the parties is centered." *Hataway,* 830 S.W.2d at 59.[14]

---

14. The most significant relationship test also incorporates the "principles stated in [Restatement] § 6," which include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability, and uniformity of result, and (g) ease in the determination and application of the law to be applied. *Hataway,* 830 S.W.2d at 59 n. 3 (quoting Restatement §§ 6 and 145).

"These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.* (quoting Restatement § 145.)

### B. Application

■ Wahl suffered her injury in Tennessee, where she has resided since 1999— a time period encompassing all of the acts relevant to this litigation. Therefore, the first factor favors the application of Tennessee law. For reasons explained herein, this is a crucial factor in a pharmaceutical products liability case.

The conduct causing Wahl's injury occurred in multiple jurisdictions. The product itself was manufactured abroad. GE is headquartered and made labeling decisions in New Jersey. Wahl's physicians, to whom GE would have a duty to warn under the learned intermediary doctrine (*see Harden v. Danek Med., Inc.,* 985 S.W.2d 449, 451 (Tenn.Ct.App.1998)), received and utilized the Omniscan at issue in Tennessee. Wahl was prescribed, bought, ingested, and was injured by Omniscan in Tennessee. Therefore, the court rejects Wahl's argument that all of the relevant conduct causing Wahl's injuries occurred in New Jersey. *See Jones v. Brush Wellman, Inc.,* No. 1:00 CV 0777, 2000 WL 33727733, at *4 (N.D.Ohio Sept. 13, 2000) ("[T]he majority of courts hold that a failure to warn occurs at the place where the plaintiffs could reasonably have been warned regardless of where the decision not to warn took place. Plaintiffs in this case encountered and were exposed to defendant's products in Tennessee. Therefore, any failure to warn which might have proximately caused plaintiffs' injuries occurred in Tennessee."); *Byers v. Lincoln Elec. Co.,* 607 F.Supp.2d 840, 848 (N.D.Ohio 2009) (analyzing Ohio law) ("[A]

defendant's alleged conduct of failure to warn occurred where the plaintiff used the product with the allegedly defective warning."); *see also Yocham v. Novartis Pharms. Corp.,* 736 F.Supp.2d 875, 882 (D.N.J.2010) ("In addition to the injury having occurred in Texas, the conduct causing injury in a prescription drug products liability case, including failure to warn and warranty cases, occurs primarily where the injured party was prescribed and ingested the drug.") Furthermore, the Restatement advises that, where conduct causing an injury may have occurred in multiple states, the law of the place of injury should control:

When conduct and injury occur in different states. On occasion, conduct and personal injury will occur in different states. In such instances, the local law of the state of injury will usually be applied to determine most issues involving the tort.... Moreover, the place of injury is readily ascertainable. Hence, the rule is easy to apply and leads to certainty of result. The local law of the state where the personal injury occurred is most likely to be applied when the injured person has a settled relationship to that state, either because he is domiciled there or resides there or because he does business there.

Restatement, § 146, cmt. e.

The parties are domiciled in different states: Wahl is a Tennessee resident, and GE has a principal place of business in New Jersey. Therefore, the third factor is essentially a wash.

As to the fourth factor, the parties' relationship, to the extent they had one, was centered in Tennessee, where Wahl was prescribed, bought, ingested, and was injured by Omniscan.[15] As explained herein,

---

15. As the *Byers* court observed, it is a logical stretch to characterize a drug manufacturer

and a patient receiving that drug through a learned intermediary as having a "relation-

the court does not construe *In re Bendectin* as compelling a different conclusion with respect to this factor.

Taken collectively and in context, these Restatement factors on balance favor the application of Tennessee substantive law to Wahl's claims. Aside from *In re Bendectin*, which presented unique circumstances not present here, it appears that the Sixth Circuit, courts within this circuit, and courts in other circuits addressing analogous circumstances, have uniformly concluded that the law of the plaintiff's place of injury applies, particularly where the place of injury is the same as the plaintiff's domicile. For example, in *Montgomery v. Wyeth*, the Sixth Circuit affirmed the district court's (reluctant) conclusion that the TPLA statute of repose barred a plaintiff's pharmaceutical product liability claims. *See generally*, 580 F.3d 455. The Sixth Circuit concluded that Tennessee "has the most significant relationship to the parties and the occurrence at issue," because "Tennessee is where [the plaintiff] sustained her injury, Tennessee is her place of domicile and residence, Tennessee is where she intended to and did use almost all of her Pondimin tablets, and Tennessee is the state where she was diagnosed and treated for injury." *Id.* at 460.[16] Many courts, adopting similar logic, have reached the same conclusion when applying the Restatement factors under analogous circumstances, generally concluding

that the law of the place of injury controls. *See, e.g., Bearden v. Honeywell*, No. 3:09–01035, 2010 WL 1223936, at *6 (M.D.Tenn. Mar. 24, 2010) ("Here, the plaintiffs reside in Tennessee, the air cleaners were installed (and, presumably, purchased) in Tennessee, and the plaintiffs' injuries occurred in Tennessee.... There is no allegation that the plaintiffs ever traveled to New Jersey in connection with the air cleaners, that they communicated with anyone from Honeywell before November 2008, or that the air cleaners were manufactured in New Jersey. Under the factors enunciated in *Hataway*, these facts point to the application of Tennessee law."); *Byers*, 607 F.Supp.2d at 846 (under Ohio choice of law principles, analyzing the Restatement factors, characterizing the "place of injury" as the "most important" factor, and concluding that law of Texas applied, because it was the state of the plaintiff's most substantial exposure to the chemical fumes at issue); *Jones*, 2000 WL 33727733, at *4 (applying Restatement factors and concluding that Tennessee law applied, where "plaintiffs' domicile is also the location of their alleged injury and of their employment, which is the site of their exposure to defendant's products"); *see also In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, No. 2:11–md–2266–DCR, 2013 WL 663575, at *2 (E.D.Ky. Feb. 22, 2013) (applying Mississippi law to Mississippi

ship" for purposes of the Restatement factors. 607 F.Supp.2d at 851. Be that as it may, in *In re Bendectin*, the Sixth Circuit, after concluding that the place of injury factor was unhelpful (if not largely irrelevant) to the choice of law inquiry under the circumstances presented, analyzed the relationship between a drug manufacturer and injured parties in terms of where the relationship was "centered." *See In re Bendectin Litig.*, 857 F.2d 290, 305 (6th Cir.1988). In the district court decision in *Montgomery v. Wyeth*, the district court characterized the relationship between a drug manufacturer and the plaintiff as

"weigh[ing] in favor" of the plaintiff's state of domicile, but called that relationship "weak." *Montgomery v. Wyeth*, 540 F.Supp.2d 933, 944 (E.D.Tenn.2008), *aff'd Montgomery*, 580 F.3d 455.

16. Wahl is correct that, in *Montgomery*, the plaintiff did not argue that the state of the defendant's principle place of business—which, in fact, was New Jersey—should control. Nevertheless, the factors that the Sixth Circuit found compelling in *Montgomery* have some persuasive weight here.

plaintiff's pharmaceutical liability claims, where she purchased and ingested product in Mississippi); *In re Aredia & Zometa Prods. Liab. Litig.*, No. 3:06–MD–1760, 2008 WL 2944910, at *2–*3 (M.D.Tenn. July 25, 2008) (applying Texas law to Texas plaintiff's failure-to-warn claims, where majority of plaintiff's prescriptions and infusions occurred in Texas); *McKinnie v. Lundell Mfg. Co.*, 825 F.Supp. 834, 836 (W.D.Tenn.1993) (applying Tennessee law to products liability claim filed by Tennessee plaintiff for injuries sustained in Tennessee, where "action's sole relationship with any state other than Tennessee is Defendant's status as an Iowa corporation"); *Harwell v. Am. Med. Sys., Inc.*, 803 F.Supp. 1287, 1294–95 (M.D.Tenn.1992) (applying Tennessee law to Tennessee plaintiff's product liability claims against a Minnesota manufacturer, where the "[i]njury occur[ed] in Tennessee"); *In re Bridgestone/Firestone*, 138 S.W.3d 202, 204–208 (Tenn.Ct.App.2003) (finding that Tennessee law did not apply, even though Tennessee-based manufacturer allegedly engaged in "conspiratorial activities" in Tennessee, because "Tennessee's tenuous links to the litigation are simply insufficient to overcome the default rule that Mexico, as the situs of the accidents at issue, will provide the applicable law").[17]

Furthermore, the additional policy factors in the Restatement favor the application of Tennessee law. The Tennessee General Assembly passed the TPLA in 1978 in response to a perceived " 'crisis' in products liability lawsuits," which it feared

was roiling the market for products liability insurance. *See Penley*, 31 S.W.3d at 187. The legislature believed that "uncertainty as to future liability increased the premiums for product liability insurance, which in turn increased the costs of production and ultimately consumer prices." *Id.* Thus, "[t]he legislature considered the limitation of future liability to a reasonable and specific period to be one of the most important keys in solving the perceived products liability crisis." *Id.* Therefore, Tennessee has a strong policy interest in the issues presented here.

Although New Jersey does have some policy interest in this lawsuit, Tennessee's policy interest is greater with respect to Wahl's product liability claims. In *Rowe v. Hoffman–La Roche, Inc.*, 189 N.J. 615, 917 A.2d 767, 769 (2007), a Michigan resident sued two New Jersey pharmaceutical manufacturers of an anti-acne drug, alleging that the manufacturers had failed to issue adequate warnings concerning the drug's health risks. Michigan law provided that an FDA-approved label would preclude liability for failure to warn, whereas New Jersey law did not. One of the defendants "manufactures, labels, and packages" the product in New Jersey, and the other defendant "markets, sells, and distributes the drug from New Jersey." *Id.* at 616, 917 A.2d 767. By contrast, the plaintiff had "lived in Michigan all his life," was prescribed the drug in Michigan, filled the prescription in Michigan, used the drug in Michigan, and suffered alleged

---

17. *See also Yocham*, 736 F.Supp.2d at 883 ("Because the injury non-fortuitously occurred in Texas as a result of conduct mostly if not exclusively occurring in Texas which was the center of the parties' relationship, the only factor that conceivably weighs against Texas as the state with the 'most significant relationship' is Defendant's presence in New Jersey. But even if Plaintiff were not a domiciliary of Texas, more or less mooting this

factor, Defendant's New Jersey presence would not outweigh all of the other connections to Texas."); *In re Prempro Prods. Liab. Litig.*, MDL Nos. 4:03CV1507–WRW, 4:04CV01202, 2008 WL 1699211, at *3 (E.D.Ark. Apr. 9, 2008) ("[T]he place where the relationship of the parties was centered in a product liability action of this type is where Plaintiff used the product—Michigan.")

injuries in Michigan. *Id.* at 622, 917 A.2d 767. Applying a "governmental interests" analysis, the court concluded that *Michigan* had the greater policy interest in the case, where Michigan had enacted the law as part of a comprehensive tort reform package and sought to make "prescription drugs more available to its residents," thereby alleviating the fear that "unlimited liability for drug manufacturers would threaten the financial viability of many enterprises and could add substantially to the cost and unavailability of many drugs." *Id.* The New Jersey court stated that, "[t]o allow a life-long Michigan resident who received an FDA-approved drug in Michigan and alleges injuries sustained in Michigan to by-pass his own state's law and obtain compensation for his injuries in this State's courts completely undercuts Michigan's interests, while overvaluing our true interest in this litigation." *Id.* at 630, 917 A.2d 767. Here, the situation is analogous: the TPLA was passed (at least ostensibly) to protect Tennessee citizens from decreased product availability and increased product costs. *See* Tenn. Pub. Acts ch. 703 Preamble. New Jersey itself has determined that its *own* interests are not paramount to those of a state that chooses to extinguish or preclude certain otherwise viable products liability claims. Therefore, the court finds that Tennessee has a greater interest in the application of its substantive law to this case than New Jersey.

Finally, as the defendants point out, a contrary holding could have detrimental implications with respect to "certainty, predictability, and uniformity of result." It would obviously benefit Ms. Wahl personally to apply a more generous statute of repose from another state (based on the place where labeling decisions were made). However, to the extent that other jurisdictions have *less* generous products liability laws than Tennessee (at least in some respects), a decision on Wahl's favor here

would not promote uniformity of results within Tennessee and could work an injustice on future Tennessee products liability plaintiffs in other contexts. For example, if a Tennessee resident sued a Michigan manufacturer that had affixed an FDA-approved label to a drug, the Tennessee resident could not recover because of Michigan's highly restrictive statutory bar. On the other hand, if another resident Tennessee sued a California manufacturer of the same drug, the plaintiff would have a valid cause of action. In both instances, the Tennessee resident's substantive rights would essentially be at the mercy of foreign legislative bodies over which the plaintiff has no control and had no contacts. It would not promote certainty, uniformity, and predictability for Tennessee citizens to be subject to the fortuitous circumstance that the drugs that injured them were labeled or manufactured in a particular foreign jurisdiction. Indeed, holding that New Jersey law governs here would essentially mean that, for any other plaintiff injured by GE's drugs, New Jersey law would trump the laws of the other 49 states and frustrate those state's rights to protect their own citizens and/or to promote particular policy goals in those states.

The plaintiffs' counter-argument is that the Sixth Circuit decision in *In re Bendectin* requires this court to apply New Jersey law. In *In re Bendectin,* the district court had conducted MDL proceedings concerning claims by over a thousand plaintiffs, who alleged that their mothers' ingestion during pregnancy of the defendant manufacturer's anti-nausea "morning sickness" drug had caused them to suffer birth defects. 857 F.2d at 293. After being given the option to opt out of a "common issues" trial, most of the plaintiffs consented to the application of Ohio law by agreeing to participate in that trial.

*Id.* at 295 and 304. Furthermore, "the plaintiffs themselves urged the district judge to apply the law of Ohio to this case, and never argued that any other law should apply. Those plaintiffs who transferred into the common issues trial had the unfettered discretion to accept the Ohio forum and the district court's previously announced decision to apply Ohio law, or to return their cases to the district where they were originally filed." *Id.* at 303. On appeal, the plaintiffs argued that the district court should have applied either Arizona or Texas law. The Sixth Circuit held that "any objections that the instructions on causation were not couched in terms of Arizona or Texas law were waived when not made before the jury retired." *Id.*

Notwithstanding this holding, the Sixth Circuit, "out of caution," proceeded to analyze the application of Ohio law under the Restatement factors for "plain error." [18] In its analysis, the Sixth Circuit minimized the plaintiffs' state of domicile. Although "plaintiffs who seek to apply the law of their state of domicile may also do so on the assumption that this is where the injury occurred[,] *[s]uch an assumption is [ ] not at all clear,* for the state of domicile at the time of suit may bear little or no relation to where a mother may have taken a morning sickness drug years before." *Id.* (emphasis added). Thus:

A plaintiff presently residing in Arizona, for example, might nonetheless be found to have taken Bendectin while traveling in many different states. In short, it is difficult to perceive any meaningful relationship to the subject matter of the lawsuit for the law of the state of domicile at the time of the suit, or the state in which the drug may have been prescribed, dispensed, ingested, or the state

in which the child may have been conceived, or born.

Having minimized the "place of injury" factor, the Sixth Circuit stated that it viewed "the law of *the state of manufacture* of the product as being more significant *in this type of case* than that of the state where an individual plaintiff happens to live." *Id.* at 305 (emphases added). The court observed that the defendant "distributed a uniform drug internationally," issued "a uniform set of warnings and instructions for use," and was subject to the laws of Ohio and/or the federal government with respect to the labeling, research, and distribution of the drug." *Id.* Accordingly, the court concluded that "the relationship between the parties is essentially centered in Ohio, where the tortious conduct and the safety of the product are regulated." *Id.*

*In re Bendectin* is distinguishable from this case for multiple reasons. As an initial matter, in contrast to *In re Bendectin,* the parties vigorously dispute which state's law should apply. Furthermore, *In re Bendectin* at most could be construed as a "plain error" review of the district court's application of Ohio law, not as an affirmative statement that, upon *de novo* review, the Sixth Circuit would have reached the same conclusion. Regardless, even taking *In re Bendectin*'s analysis at face value, the circumstances presented there differed from those presented here in several crucial respects. Here, unlike the anti-nausea medication at issue in *In re Bendectin,* the place of injury *is* readily ascertainable and is not subject to dispute. Moreover, unlike an anti-nausea medication that presumably could have been ingested anywhere, at any time, Omniscan was administered as part of monitored

**18.** As this court reads the opinion, the entire discussion of the choice of law issue in *In re* *Bendectin* is arguably *dicta.*

medical procedures at specific facilities. Thus, there is a meaningful relationship between Wahl's readily ascertainable place of injury and the associated administrations of Omniscan. Accordingly, although the "place of injury" factor was essentially granted no weight in *In re Bendectin,* the place of injury factor is relevant under the circumstances presented here.

Moreover, *Bendectin* held that the state of "manufacture" was relevant for the choice of law analysis, and the state of manufacture happened to be the same jurisdiction in which labeling decisions were made. Here, the facts are different: the product was manufactured abroad and the labeling decisions were made in New Jersey.

Subsequent to *In re Bendectin*—notwithstanding the analysis contained therein—many courts, including the Sixth Circuit in *Montgomery,* have continued to find that the law of the state of injury and/or domicile governs in pharmaceutical product liability actions. *See, e.g., Montgomery,* 580 F.3d at 461–62 (distinguishing *In re Bendectin* ); *Jones,* 2000 WL 33727733, at *4 (same); *Byers,* 607 F.Supp.2d at 847–849 (same); *In re Am. Med. Sys.,* 75 F.3d 1069 (6th Cir.1996) (reversing trial court's grant of class certification, where trial court failed to consider that putative class members' claims would be governed by the laws of their home states—not the state of product manufacture—which would vary substantially); *Bowling v. Pfiz-*

*er,* 143 F.R.D. 141, 163 (S.D.Ohio 1992) (limiting *In re Bendectin* to its facts). Indeed, the plaintiffs have not identified any case in which a court has followed *In re Bendectin* and concluded that the substantive law of the state of manufacture and/or labeling decisions applied. Whatever continuing viability *In re Bendectin* has, it does not apply to the circumstances presented here.

■ On a separate note, the court acknowledges the parties' various submissions regarding positions taken by other plaintiffs and courts in the MDL and/or in other GBCA cases nationwide. In Pennsylvania state court, for example, the parties disputed whether New Jersey law should apply to the issue of punitive damages: the plaintiffs argued *against* the application of New Jersey law, while the defendants argued *for* it. The positions of other parties in Pennsylvania prove nothing here: the court denied the motion, the representations cut both ways, and it appears that that court already intended to apply the law of Pennsylvania to the plaintiffs' underlying (non-punitive) claims in the first place. Moreover, under the doctrine of depecage, there is no inconsistency in applying the law of one state to a particular issue (such as compensatory claims) and the law of a different state to another issue (such as punitive damages claims). *See Byers,* 607 F.Supp.2d at 846 n. 16.[19] The defendants have also represented

---

**19.** The application of different states' laws to separate issues in the same case is known is "depecage." *Byers,* 607 F.Supp.2d at 846 n. 16; *see also N.H. Ins. Co. v. Carleton,* 502 Fed.Appx. 478, 484 n. 7 (6th Cir.2012); *Aguirre Cruz v. Ford Motor Co.,* 435 F.Supp.2d 701, 707 (W.D.Tenn.2006) (in product liability lawsuit by Tennessee plaintiff, applying doctrine of depecage, concluding that Michigan law governed—and therefore barred—plaintiff's request for punitive damages, and expressly declining to "make any comment on the law governing the underlying tort claims in this matter or the request for compensatory or other damages"); *In re Disaster at Detroit Metro. Airport on Aug. 16, 1987,* 750 F.Supp. 793 (E.D.Mich.1989) (criticizing parties for ignoring principle of depecage in complex case, and stating that "[t]he search is these cases is not to determine which state law will be applied to all of the issues in a case, but to identify the rule of law that will be applied to each particular issue in which a conflict is presented").

that, in its administration of the MDL "bellwether cases," the MDL court consistently applied the law of the state where the plaintiff allegedly was injured to substantive claims asserted against GE. Indeed, it seems that the MDL Court was operating under the assumption that the substantive law of the place of injury would govern.

In conducting its choice of law analysis, the court has not relied upon the litigation positions taken by the plaintiffs in other cases. That said, it is notable that the MDL Court (and the parties) in other Omniscan cases appear to have taken for granted what Wahl here disputes: that the law of the place of her injury and domicile—Tennessee—governs her claims.

■ In sum, the law of Tennessee governs Wahl's claims. The undisputed facts establish that the TPLA statute of repose bars her claims as a matter of law.

On a final note, although it is unavoidable, the court views the result in this case as manifestly unjust. Through no fault of her own, Wahl is left with an essentially incurable degenerative condition for which she has no recourse, because Tennessee extinguished her claims against GE before she could have discovered them. The time period here between the procedures at issue and Wahl's NSF diagnosis was only about four years, which is not a time period that shocks the conscience. This court, as did Judge Collier in *Montgomery*, 540 F.Supp.2d at 936 and 945, urges the Tennessee General Assembly to revisit the TPLA and its effect on Tennessee citizens injured by pharmaceutical products.

## CONCLUSION

For the reasons stated herein, GE's Motion for Summary Judgment will be grant-

ed and Wahl's claims will be dismissed with prejudice.

An appropriate order will enter.

### ORDER

For the reasons set forth in the accompanying Memorandum, the defendants' Motion for Summary Judgment (Docket No. 35) is **GRANTED**. The plaintiff's claims are hereby **DISMISSED WITH PREJUDICE**. Entry of this Order shall constitute judgment in the case.

It is so **ORDERED**.